**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

SHAQUANA D. DUNCAN as general administrator and administrator <u>ad prosequendum</u> of the estate of JAMEEK LOWERY,

      *Plaintiff*,

    v.

CITY OF PATERSON, NEW JERSEY, et al.,

      *Defendants*.

No. 20-cv-08471 (MEF)(AME)

<u>**OPINION and ORDER**</u>

**Table of Contents**

**I.**   <u>**Background**</u>

    **A.**   <u>**The Facts**</u>

    **B.**   <u>**Procedural History**</u>

    **C.**   <u>**The Motions**</u>

    **D.**   <u>**The Court's Approach**</u>

**II.**  <u>**The City**</u>

    **A.**   <u>**Supervision**</u>

        **1.**  <u>**Public Complaints**</u>

        **2.**  <u>**The Junior Officers**</u>

        **3.**  <u>**Paperwork**</u>

        **4.**  <u>**The Veteran Officer**</u>

        **5.**  <u>**The Evidence as a Whole**</u>

    **B.**   <u>**Training**</u>

        **1.**  <u>**The Junior Officers**</u>

        **2.**  <u>**The Veteran Officer**</u>

### 3.  The Evidence as a Whole

### C.  Conclusion

## III. The Officers

### A.  The Legal Standard

### B.  The Administrator's Cases

## IV.  State Claims

## V.  Conclusion

*    *    *

A man was having a medical emergency, and police officers aided him; he then lashed out physically, and the officers restrained him.  Two days later, the man died.

The administrator of the deceased man's estate sued.  She named, among others, the police officers and their employer, the City of Paterson.

The officers and the City now move for summary judgment.

The motions are mainly granted.

*    *    *

## I.  Background

### A.  The Facts

As relevant for now, the undisputed facts are as follows.

Early on the morning of January 5, 2019, a man had a medical episode after using drugs.  <u>See</u> Def.'s Statement of Undisputed Material Facts Pursuant to F.R.C.P. 56.1(a) in Supp. of its Mot. for Summ. J. ("City's Facts") (ECF 103-1) ¶ 1–2; Pl.'s Resp. to Def. City of Paterson's Statement of Undisputed Material Facts ("Resp. to City's Facts") (ECF 104-2) ¶ 1–2.

He came to the Paterson Police Department headquarters in distress, foaming from the mouth and "'delirious.'"  <u>See</u> City's Facts ¶¶ 55, 59; Resp. to City's Facts ¶¶ 55, 59.[1]

---

[1]  Earlier that morning, an ambulance had taken the man to a local hospital.  He ran back and forth in the waiting room and jumped on the registration desk.  Hospital security escorted him to a taxi; the taxi was driving the man home when, at a red

Police called an ambulance.  See City's Facts ¶ 69; Resp. to City's Facts ¶ 69.

But when it arrived, the man ignored a direction to go towards it.  See City's Facts ¶ 71; Resp. to City's Facts ¶ 71.

Three police officers[2] then started escorting the man toward the ambulance; at that point, he began walking in the right direction and got in.  See City's Facts ¶ 72; Resp. to City's Facts ¶ 72.

Inside the ambulance, the man's demeanor changed.  See City's Facts ¶ 75; Resp. to City's Facts ¶ 75.  He began hitting and kicking the officers.  See City's Facts ¶¶ 75-76; Resp. to City's Facts ¶¶ 75-76.

The officers restrained the man; they pinned him[3] on a stretcher in the ambulance.  See id. City's Facts ¶¶ 78-79; Resp. to City's Facts ¶¶ 78-79.

The ambulance took the man to a hospital; two days later, he died.  See City's Facts ¶¶ 2, 107; Resp. to City's Facts ¶¶ 2, 107.

### B.  **Procedural History**

As to the man who passed away, the woman who is the administrator of his estate[4] filed a lawsuit.  See First Amended Complaint ("Complaint") (ECF 31) ¶ 5.

From here, she is called "the Administrator."  And the man who died is called "the Plaintiff."

The lawsuit named two sets of defendants.

---

light, he got out of the car and ran toward police headquarters. See City's Facts ¶¶ 9, 12, 18, 21, 25, 37, 40-41, 48; Resp. to City's Facts ¶¶ 9, 12, 18, 21, 25, 37, 40-41, 48.

[2]  Michael Avila, Mucio Lucero, and Kyle Wanamaker.

[3]  Seemingly using handcuffs, though the record on this point is not crystal clear.  See City's Facts ¶¶ 78-79; Resp. to City's Facts ¶¶ 78-79.

[4]  Shaquana D. Duncan.

\*     \*     \*

<u>First</u>, the Administrator sued the three police officers involved in the above-described events.  These officers are the main focus here, so they are called "the Defendants."[5]

As to the Defendants, the lawsuit includes (a) a federal claim and (b) four claims under New Jersey law.[6]

The federal claim (Count I) alleges use of excessive force in violation of the Fourth Amendment to the United States Constitution.  <u>See</u> Complaint ¶¶ 36–42.  The cause of action comes from 42 U.S.C. § 1983.  <u>See</u> <u>id</u>. ¶ 42.

One state claim (Count VII) is for wrongful death under N.J.S.A. 2A:31-1 et seq.  <u>See</u> <u>id</u>. ¶¶ 80–85.  Another is for survival damages (Count VIII) under N.J.S.A. 2A:15–3.  <u>See</u> <u>id</u>. ¶¶ 86–88.  And then there are common-law claims --- for excessive force, <u>see</u> <u>id</u>. ¶¶ 57–61 (Count III), and assault and battery, <u>see</u> <u>id</u>. ¶¶ 62–67 (Count IV).

\*     \*     \*

<u>Second</u>, the Administrator sued the Defendants' employer, the City of Paterson ("the City").[7]

As to the City, the complaint includes (a) a federal claim and (b) three claims under New Jersey law.

The federal claim (Count II) is for municipal liability related to alleged underlying Fourth Amendment violations.  <u>See</u> <u>id</u>.

---

[5]  Recall: Michael Avila, Mucio Lucero, and Kyle Wanamaker.

[6]  From reading the complaint, it is hard to tell which counts run against which defendants.  But the Administrator's briefs clear things up.  <u>See</u> Br. in Opp. to Def. Officer Mucio Lucero's Mot. for Summ. J. ("Opp. to Officer Lucero") (ECF 105) at 1; Br. in Opp. to Def. Officer Kyle Wanamaker['s] Mot. for Summ. J. ("Opp. to Officer Wanamaker") (ECF 106) at 1; Br. in Opp. to Def. Officer Michael Avila's Mot. for Summ. J. ("Opp. to Officer Avila") (ECF 107) at 1.

[7]  The Administrator sued other defendants, too.  This Opinion and Order does not concern them.

¶¶ 43-56.  The cause of action is again provided by 42 U.S.C. § 1983.  See id. ¶ 56.

The New Jersey law claims against the City: one (Count VII) for wrongful death under N.J.S.A. 2A:31-1 et seq, see id. ¶¶ 80-85; another (Count VIII) for survival damages under N.J.S.A. 2A:15-3, see id. ¶¶ 86-88; and a third (Count V) for negligent retention and supervision.  See id. ¶¶ 68-74.

### C.  **The Motions**

Four motions for summary judgment are before the Court.

One from each of the three Defendants, and one from the City. See Mem. of Law in Supp. of the Defs.' Mot. for Summ. J. ("Officer Lucero's Br.") (ECF 99-1); Br. in Supp. of Def.'s Mot. for Summ. J. ("Officer Avila's Br.") (ECF 100); Def. Kyle Wanamaker's Br. in Supp. of His Mot. for Summ. J. Pursuant to Fed. R. Civ. P. 56 ("Officer Wanamaker's Br.") (ECF 101-2); City of Paterson's Mem. of Law in Supp. of Its Mot. for Summ. J. ("City's Br.") (ECF 103).

### D.  **The Court's Approach**

In Part II, the Court takes up the City's summary judgment motion[8] as to the federal claim against it.

---

[8]  The normal rules for working through a summary judgment motion are in play throughout this Opinion and Order.  "[A] district court may not make credibility determinations or engage in any weighing of the evidence[.]"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004).  And a district court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 345 (3d Cir. 2022) (cleaned up); accord Tolan v. Cotton, 572 U.S. 650, 660 (2014).  To win on summary judgment, a party must show two things: first, "that there is no genuine dispute as to any material fact"; and second, that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Dupree v. Younger, 598 U.S. 729, 737 (2023); Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 74 F.4th 96, 100 (3d Cir. 2023).

The Court's conclusion: the motion must be granted, because the evidence does not support either a viable failure-to-supervise claim or a viable failure-to-train claim.

In Part III, the Court assesses the Defendants' motions as to the federal claims against them.

The Court's conclusion: the motions must be granted, because the Defendants have qualified immunity.[9]

In Part IV, the Court considers the various New Jersey law claims against the City and the Defendants.  As to those, the Court declines to exercise jurisdiction.

## II.  **The City**

As to the City's summary judgment motion on the federal claim against it, start with some legal background.

A damages claim can generally get off the ground only when two things are put on the table --- (a) a relevant substantive body of law, and (b) a cause of action that allows for a lawsuit under that body of law.  See Rxeed LLC v. Caremark LLC, 771 F. Supp. 3d 495, 498 (D.N.J. 2025).

---

[9]  In a bread-and-butter tort suit in which the key events are an agent's actions, the fact that the agent is not liable typically means that the principal cannot be liable.  See, e.g., Morales v. Town of Johnston, 895 A.2d 721, 728 (R.I. 2006); Hatcher v. Bellevue Volunteer Fire Dep't, 262 Neb. 23, 36 (2001); Lincoln v. Gupta, 142 Mich. App. 615, 622 (1985); 2A C.J.S. Agency § 452.  But that is not how things generally work when then it comes to Section 1983 and constitutional torts.  A municipality (the principal) can potentially be liable under Section 1983 even if its employees (the agents) have immunity (here, qualified immunity), and therefore are not themselves liable for that reason.  See Owen v. City of Independence, 445 U.S. 622, 638 (1980); Collins v. City of Harker Heights, 503 U.S. 115, 122 (1992); Mervilus v. Union County, 73 F.4th 185, 196 (3d Cir. 2023); In re City of Phila. Litig., 49 F.3d 945, 975 (3d Cir. 1995) (Scirica, J., concurring); Bittner v. Snyder County, 345 F. App'x 790, 792 (3d Cir. 2009); First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago, 988 F.3d 978, 992 (7th Cir. 2021).  That is why the Court (in Part II) takes up the City's possible liability --- even though the Court concludes (in Part III) that the City's agents, the Defendant-police officers, are not liable, because they have qualified immunity.

In this case, as noted, the Administrator points to the Fourth Amendment as the source of the substantive law that is said to be in play.  See Part I.B; see also Complaint ¶ 55 (invoking the "Fourth Amendment [r]ight[] to be free from excessive force at the hands of the police").

And the Administrator invokes Section 1983 as her cause of action.  See id. ¶ 56.

That cause of action carries with it certain limits on who can be sued and in what circumstances.  And some of those limits are central to the analysis here.

Take them up now.

*    *    *

Employers are often liable for the on-the-job torts of their employees.  See 1 American Law of Torts § 4:3; 1 Modern Tort Law: Liability and Litigation § 7:15 (2d ed. 2025)

But Section 1983 shifts this background rule to an extent.

Under Section 1983, a municipality is not held to account for everything its employees do.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–92 (1978).

Rather, a municipality is typically responsible for its employees' actions only in two main circumstances.

First, if the employees' conduct was tied in a tight enough way to an affirmative (and improper) municipal policy or custom.  See Forrest v. Parry, 930 F.3d 93, 105 (3d Cir. 2019).

And second, if the municipal employees' conduct was linked to a passive failure on the part of the municipality --- like a failure by the municipality to properly train or supervise its employees.  See id.

Here, the Administrator invokes the second theory.

She argues: the City is liable for the actions of the Defendants, its employees, because it did not do enough in the way of police supervision or training.  See Complaint ¶¶ 53–55.

Consider, first, the Administrator's failure-to-supervise claim, see Part II.A, and then her failure-to-train claim.  See Part II.B.

### A.   <u>Supervision</u>

To establish municipal liability on a Section 1983 failure-to-supervise theory, the Administrator must show that the asserted failure amounted to "a deliberate or conscious choice," <u>Forrest</u>, 930 F.3d at 105 (cleaned up), the "functional equivalent of a decision by the city itself to violate the Constitution." <u>Connick</u> v. <u>Thompson</u>, 563 U.S. 51, 61-62 (2011) (cleaned up).

To clear this bar, the Administrator offers four failure-to-supervise arguments.

These are discussed below --- each in turn, and then together.

### 1.   <u>Public Complaints</u>

The Plaintiff's first failure-to-supervise argument: the City did not properly work through complaints made by members of the general public against its officers. <u>See</u> Br. in Opp. to Def. City of Paterson's Mot. for Summ. J. ("Opp. to City") (ECF 104) at 9, 14-15.[10]

To support this argument, the Administrator mainly points to a statistic: the City did not sustain[11] any of the 27 use-of-force complaints it received during 2013 to 2019. <u>See</u> Opp. to City at 9; Officer Lucero's Mot. for Summ. J., Ex. 11 ("Ex. 11") (ECF 99-11), at 106-12.[12]

---

[10] Like many municipalities, the City has a system in place for (a) receiving public complaints about police officers' conduct; (b) adjudicating the complaints to see if they hold up; and, if they do, (c) disciplining officers as may be appropriate. <u>See</u> City's Facts ¶¶ 125, 129, 133; Resp. to City's Facts ¶¶ 125, 129, 133.

[11] A "sustained" complaint is one that has been investigated and has been found to be well-enough grounded in the facts of what happened.

[12] Two things. <u>First</u>, at one point the Administrator suggests the City did not have any process for reviewing officers' use-of-force incidents. <u>See</u> Opp. to City at 9. But the record includes a seven-page chart that lists out complaints received in 2013-19, along with the outcome of the review of each. <u>See</u> Ex. 11 at 106-12. <u>Second</u>, the Administrator asserts that the City failed to "sustain," <u>see</u> footnote 11, <u>any</u> excessive-force complaints. <u>See</u> Opp. to City at 9. But this glides over

Under Third Circuit law, statistics like this can matter. To see how, look to three key cases.

\*    \*    \*

The stepping off point is Beck v. City of Pittsburgh, 89 F.3d 966 (3d Cir. 1996).

There, the Third Circuit suggested that a police force's low sustained rate can help to make out the case for municipal liability.  See id. at 975.

But Beck also implies that "mere statistics" are generally not enough, by themselves, to establish that a city has not properly supervised its officers.  See id. at 973, 975.

Per the Third Circuit in Beck, the city in question had a "sterile and shallow" way of doing its investigative work.  That hived off complaints one from the next, and made it hard to see whether complaints might be best understood as part of a broader pattern.  See id. at 973.

The city also disregarded witness testimony "merely because the witnesses had accompanied the complainant at the time of the incident," id., while accepting an officer's response at face value.  See id.

And the city did not have a "formal system in place for tracking complaints."  See id. at 975.

In the end, all of this added up.  A reasonable jury, the court of appeals held, could find that the city was liable.  See id. at 975-76.

Not, it seems, just because of the numerical data the plaintiff came forward with.  But because the plaintiff had gone further. He "presented considerably more than mere statistics."  Id. at 975.

---

evidence that pushes the other way.  The report from the Administrator's expert shows two partly sustained force-related complaints.  One for an incorrect use-of-force report in 2013 and another for similar reasons in 2014.  See Ex. 11 at 112. And in 2014, a third excessive-force complaint resulted in a referral to prosecutors.  See id. at 111.

Move now to <u>Estate of Roman</u> v. <u>City of Newark</u>, 914 F.3d 789 (3d Cir. 2019).

In <u>Roman</u>, the Third Circuit threw a disapproving spotlight on the city's sustained-complaint rate.  It was "troubling," the court of appeals indicated, that city investigators sustained "only one complaint out of 261 filed."  <u>Id</u>. at 801.

It is not perfectly clear that the 1/261 ratio made a bottom-line difference.  The court of appeals held that a plausible claim for municipal liability had been made out <u>before</u> it got to the city's low sustained rate.  <u>See id</u>. at 800.

But assuming that the 1/261 sustained rate provided a basis for city liability, it was hardly the <u>only</u> basis.

The allegations the Third Circuit dwelled on in <u>Roman</u> were, among others, that the city in question failed to train its officers on the law of search and seizure.  <u>See id</u>. at 800-02.  That it conducted a significant number of searches "without legal justification."  <u>See id</u>. at 800 (cleaned up).  That its investigative reports were untruthful.  <u>See id</u>.  That it fostered "a culture in which officers 'knew there would be no professional consequences for their actions.'"  <u>Id</u>. at 801 (cleaned up).  And that it had entered into a recent consent decree with federal authorities in light of serious policing failures.  <u>See id</u>. at 797.

In <u>Roman</u>, in short, overall numbers may have been a piece of the story.  But they did not sit out on an island, alone.  The numbers were paired up with other allegations, which pushed in the same rough direction, toward municipal liability.

In <u>Roman</u> as in <u>Beck</u>, there was "considerably more than mere statistics," <u>Beck</u>, 89 F.3d at 975 --- and the court of appeals held that the plaintiff's claim stood up against the city.

Look, finally, to <u>Forrest</u> v. <u>Parry</u>, 930 F.3d 93 (3d Cir. 2019).

For a four-year period, seven of a city's 622 complaints of serious misconduct were sustained, a rate of around 1%.  <u>See id</u>. at 102.

This mattered.

The Third Circuit seemed to refer to this statistical evidence, <u>see id</u>. at 108, in holding that that a reasonable jury could

10

find that the city was liable for failing to supervise its officers.  See id. at 108-09.

But again, the sustained-rate number did not, alone, seal the deal for the plaintiff.  It was "combined," id. at 108, with other evidence, that the Third Circuit walked through at length. See id. at 101-04.

Evidence that investigations never took place because of "an extensive, recurring backlog."  See id. at 101-02.  That those investigations "that were conducted were seriously deficient." Id. at 102.  That investigators based their conclusions "solely" on what police officers had to say.  See id.  That the department did not conduct performance reviews.  See id.  That it did not track officers' whereabouts.  See id.  And that it maintained an off-kilter sergeant-to-officer ratio.  See id.

                              *    *    *

Beck, Roman, and Forrest point in the same direction.

Namely:

When it comes to handling complaints from the general public, a low sustained rate can help to establish a city's failure-to-supervise liability under Section 1983, but typically as a part of a broader mix of "troubling"[13] information --- as to subpar policing practices (as in Roman) or as to the way complaint investigations tend to unfold (as in Beck, Roman, and Forrest).

In a nutshell, the Third Circuit's approach is holistic. Accord, e.g., Strauss v. City of Chicago, 760 F.2d 765, 768-69 (7th Cir. 1985).

"[M]ere statistics," Beck, 89 F.3d at 973, 975, do not generally do it.  The focus is zoomed out, on the fuller body of information.  The quantitative evidence, including a low sustained rate as to public complaints.  And also the qualitative evidence --- as to how, for example, investigations of public complaints are generally conducted.[14]

---

[13]  Roman, 914 F.3d at 801.

[14]  Why look beyond statistics?  One reason: without kicking the tires by looking to qualitative information, it can be tricky to know whether a low rate is or is not a surface indication of potentially improper practices.  Think of a police department that aims to pull down barriers to entry for complaints from the

       *   *   *

Come back now to this case.

All of the above suggests this: the City's low-seeming sustained rate for public complaints moves the needle in the Administrator's direction on her failure-to-supervise claim; but it does so only to a limited extent.

That is consistent with the Third Circuit's approach in <u>Beck</u>, <u>Roman</u>, and <u>Forrest.</u>

       *   *   *

And another point.

---

general public.  It might decide to intake complaints not just in station houses, but also via text messages or social media. To accept complaints in English and also in other languages. And to say yes to complaints that have names attached --- and also to those that come in anonymously.  <u>Cf.</u> Joanna C. Schwartz, <u>What Police Learn from Lawsuits</u>, 33 Cardozo L. Rev. 841, 865–67 & nn.143–44 (2012) (describing police efforts to receive more complaints).  All of this would likely push up on the number of complaints received.  <u>See</u> John L. Worrall, <u>If You Build It, They Will Come: Consequences of Improved Citizen Complaint Review Procedures</u>, 48 Crime & Delinquency 355, 375 (2002) (so finding, based on a study of hundreds of police departments).  But all of this might also change the mix of incoming complaints --- so that while the denominator (of total incoming complaints) gets larger, the numerator (of sustained claims) does not grow in precise lock-step.  Anonymous complaints, for example, may potentially be less reliable.  (Our law presumes this in a range of contexts.  <u>See</u>, <u>e.g.</u>, <u>Wu</u> v. <u>GSX Techedu Inc.</u>, 738 F. Supp. 3d 527, 541 (D.N.J. 2024) and <u>id</u>. n.12.)  Therefore, such complaints may be less likely to be sustained.  Or, to stick with the example, anonymous complaints may be plenty reliable --- but harder to sustain as a practical matter because, without an easy-to-locate complaining witness to talk to, they are especially challenging to investigate.  In short: to know what to make of a low-seeming sustained rate, more information may well be needed to thoughtfully interpret the top-line number. And this implies the need to range more broadly --- to look for more than "mere statistics," to fold qualitative evidence into the mix.

In this case, there are two _additional_ reasons to think that the sustained rate, standing alone, is not especially telling.

*    *    *

To see the _first_ reason, note that when a statistic is expressed as a percentage (as in the case of a sustained rate), it is formed by dividing a denominator (number of total complaints) by a numerator (number of sustained complaints). The reliability of the percentage depends in part on how big the denominator is. A smaller denominator is generally less reliable. _See generally_, _e.g._, Charity J. Morgan, _Use of Proper Statistical Techniques for Research Studies with Small Sample Sizes_, 313 Am. J. Physiology L873 (2017); _cf_. Honda Motor Co. v. Oberg, 512 U.S. 415, 433 n.11 (1994) ("It is well known that one cannot draw valid statistical inferences from such a small number of observations.").

In _Roman_, the sustained rate was based on a denominator of 261. _See_ 914 F.3d at 801. In _Forrest_, the sample size was 622. _See_ 930 F.3d at 102. In _Beck_, there were 188 total complaints. _See Beck_, 89 F.3d at 975.

Here, the number is much smaller --- 27 use-of-force complaints. _See_ Ex. 11 at 106–12.

If, in general, "mere statistics," _Beck_, 89 F.3d at 973, 975, are meaningfully clarifying only when they are paired up with qualitative evidence, then there is _special_ reason to look to qualitative back-up where, as here, there is relatively less to go on, when the denominator is much smaller.

After all, in small-sample-size cases like this one, the top-line sustained-rate number starts off on its back foot. It can bear less weight by itself because it is less reliable than it would be if the sample size were large --- as it was in _Roman_, _Forrest_, and _Beck_.

*    *    *

And there is a _second_ reliability issue here, too.

Looking to "mere statistics" can be precarious not just when there is a small denominator, but also when there may be issues with the numerator --- bona fide questions as to how to classify data on the road to generating a reasonably accurate (and therefore useful) sustained rate.

13

A 1 percent sustained rate (as in <u>Forrest</u>, <u>see</u> 930 F.3d at 102) seems low.  A .38 percent rate (as in is <u>Roman</u>, <u>see</u> 914 F.3d at 801) is lower yet.

And here, the Administrator says, the sustained rate is rock-bottom, 0 percent.  <u>See</u> Opp. to City at 9.

But is 0 percent the right way to think about things?

What to make of the complaint investigation that led to a criminal referral, to the case being sent to prosecutors?  <u>See</u> footnote 12.  If that counts as sustained (and why would it not?) the sustained rate here is suddenly a good deal higher --- nearly 4 percent.

And how to count the two partly sustained complaints?  <u>See</u> <u>id</u>. Are they to be chalked up as sustained?  (In which case the overall sustained rate is 11 percent.)  Or maybe each partially sustained complaint should count as half sustained?  (For a rate of 7 percent.)

On a harder look, is the sustained rate here 0 percent, as the Administrator suggests?  Or is it better understood as running at a higher clip --- at 4 percent or a bit more?

These questions, which the Administrator does not take on, make it that much more difficult to analyze the data, and therefore to draw reliable enough inferences based on it.

And that is another reason why, in this case, there is an added basis for looking to qualitative evidence, as a supplement to the sustained rate statistic.

*   *   *

Where things stand:

The Administrator has put forward data as to the City's sustained rate.  <u>See</u> Opp. to City at 9.

But these are "mere statistics."  <u>Beck</u>, 89 F.3d at 973, 975. They largely stand alone.

The top-line number is not accompanied by telling qualitative evidence.  There are no indications, for example, that City investigators generally based their conclusions just on an officer's word, <u>see</u> <u>Forrest</u>, 930 F.3d at 102, or did not investigate most complaints, <u>see</u> <u>id</u>., or failed to track the complaints that came in.  <u>See</u> <u>Beck</u>, 89 F.3d at 974.

14

And in this case, there are particular reasons not to lean too heavily on just the sustained rate.

First, the sample size here is relatively small.  And second, the sustained rate may not, in fact, be as straightforward to calculate (or as low) as the Administrator suggests.

Given all this, while the low-seeming sustained rate tilts the scale a bit in the Administrator's direction, it does not do so very far --- and certainly not far enough to make out a potentially viable failure-to-supervise claim.

### 2.    **The Junior Officers**

Move away now from the sustained rate, and take up the second asserted basis for the Administrator's failure-to-supervise claim.

Namely, the Administrator emphasizes that the City paired together for patrol two of the Defendant-officers,[15] each of whom had less than six months on the force.[16]  See Opp. to City at 13-14.

                        *    *    *

But the Administrator does not explain how this might veer near the "functional equivalent of a decision by the city itself to violate the Constitution."  Connick, 563 U.S. at 61-62 (cleaned up).[17]

---

[15]  Mucio Lucero and Kyle Wanamaker.

[16]  How did the junior officers become involved here?  They were patrolling City streets when a dispatcher summoned them to police headquarters to help with the Plaintiff.  See City's Mot. for Summ. J., Ex. H ("Wanamaker Dep.") (ECF 103-8) at 22-24; see also City's Facts ¶ 57; Resp. to City's Facts ¶ 57.

[17]  For its part, the City argues that the two-person pair-up was a good thing, that it shows that the officers were "eased into patrol and not 'set loose' onto the streets" by themselves. Def., City of Paterson's Reply Mem. of Law in Further Supp. of its Mot. for Summ. J. (ECF 109) at 9; contrast United States v. McGibney, 2021 WL 2411389, at *1 (N.D. Ind. June 14, 2021) ("Despite being a probationary officer, Youpel patrolled on his own, without a partner or supervising trooper.").

And if there is evidence that sending out two junior officers generally presents serious risks, then that is for the Administrator to come forward with.  See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

She has not done so.

*    *    *

And another point: the Administrator "bears the burden of proving that the municipal practice was the proximate cause of the injuries suffered."  Beck, 89 F.3d at 972 n.6.

But here, too, she falls short.

The Administrator has not tried to show that sending out two junior officers to patrol together was "the proximate cause" of the Plaintiff's injury --- that is, "a substantial contributing factor in bringing about the harm alleged."  Robertson v. Allied Signal, Inc., 914 F.2d 360, 366-67 (3d Cir. 1990).

### 3.  Paperwork

The Administrator's third failure-to-supervise argument: the Defendants submitted erroneous use-of-force reports after the incident involving the Plaintiff, and their superiors approved the reports.  See Opp. to City at 13.

But again: to establish municipal liability a causal chain must run from the asserted supervisory failure (here, related to subpar paperwork) to the resulting injury (to the Plaintiff). See A.A. by Alcis v. Sch. Dist., 2020 WL 6822963, at *6 (E.D. Pa. Nov. 19, 2020) (citing Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997)); Moore v. City of Desloge, 647 F.3d 841, 849 (8th Cir. 2011); cf. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).

But the incident reports here were put together after the incident.  How they might have caused the incident in the first place is not explained by the Administrator.[18]

---

[18]  In some circumstances, failure to complete post-incident paperwork by a particular set of officers might be taken as proof of a preexisting failure to properly fill out reports. Time 1 paperwork gaps can make supervision more difficult at Time 2 --- maybe to the point of helping to establish a failure-to-supervise claim based on Time 3 officer actions.  See Beck,

### 4.   **The Veteran Officer**

The Administrator's final argument: the City, she argues, failed to properly supervise one of the Defendants here --- Michael Avila, who had been the subject of complaints from members of the public, and had been disciplined.  <u>See</u> Opp. to City at 14.

To evaluate this argument, start with the facts then look to the law.

\*    \*    \*

Officer Avila had served 14 years on the City's police force at the time of the incident.  <u>See</u> City's Mot. for Summ. J., Ex. J ("Avila Dep.") (ECF 103-10) at 16:17–24.

During those years, he was the subject of around 30 investigations.  <u>See</u> City's Br. at 10 (citing City's Mot. for Summ. J., Ex. V ("Ex. V") (ECF 103-23)).  Eight of these involved allegations of excessive force.  <u>See</u> <u>id</u>.  Of the eight, one was sustained.  <u>See</u> <u>id</u>; Ex. V at 56.

The details as to what happened in that incident are sparse.  But it appears undisputed that Officer Avila pushed someone to the ground after she scratched his eye.  <u>See</u> Avila Dep. at 123:14–16; <u>see also</u> Opp. to Officer Avila at 7 (adopting this version of events).

For that violation, the City suspended Officer Avila for 90 days.  <u>See</u> Opp. to Officer Avila at 7.  After the suspension, it appears that Officer Avila was taken off the beat and transferred to the radio room for about one year.  <u>See</u> Avila Dep. (ECF 103-10) at 20:18–24.  And after that, Officer Avila was switched to the property room, where, to stay out of the public eye, he worked for "[a]bout two and a half years."  <u>Id</u>. at 22:12–23:11.

\*    \*    \*

A city may be liable for failing to supervise an officer with a poor disciplinary record.  <u>See</u>, <u>e.g.</u>, <u>Vann</u> v. <u>City of New York</u>, 72 F.3d 1040, 1051 (2d Cir. 1995).

---

89 F.3d at 974.  The Administrator briefly suggests that this may be what she is driving at.  <u>See</u> Opp. to City at 9.  But she develops no meaningful argument along these lines.

But the test is difficult to pass.

The Second Circuit has long held that "deliberate indifference may be inferred if the complaints are followed by <u>no meaningful attempt</u> on the part of the municipality to investigate or to forestall further incidents." <u>Vann</u>, 72 F.3d at 1049 (emphasis added).

And the Second Circuit's <u>Vann</u> formulation, or a variant on it, has been widely adopted.

Some circuits follow <u>Vann</u> expressly. <u>See</u> <u>Baez</u> v. <u>Town of Brookline</u>, 44 F.4th 79, 83 (1st Cir. 2022); <u>Johnson</u> v. <u>Halstead</u>, 916 F.3d 410, 418 (5th Cir. 2019).

Others follow what is closely akin to the <u>Vann</u> rule --- including the Eighth Circuit, <u>see</u> <u>Harris</u> v. <u>City of Pagedale</u>, 821 F.2d 499, 508 (8th Cir. 1987), and, in a series of unreported cases, the Third Circuit. <u>See</u> <u>Slaughter</u> v. <u>Rogers</u>, 408 F. App'x 510, 512 (3d Cir. 2010); <u>Panton</u> v. <u>Nash</u>, 317 F. App'x 257, 259 (3d Cir. 2009); <u>Heggenmiller</u> v. <u>Edna Mahan Corr. Inst. for Women</u>, 128 F. App'x 240, 247 (3d Cir. 2005).

<u>Vann</u>'s "no meaningful attempt" is a hard mark for a plaintiff to hit.

And applying the <u>Vann</u> standard, or something closely similar to it, courts routinely hold that there is no "deliberate indifference" when a city has attempted "to forestall further incidents" by "meaningful[ly]" investigating or discipling a violator. <u>See</u>, <u>e.g.</u>, <u>Slaughter</u>, 408 F. App'x at 512; <u>Panton</u>, 317 F. App'x at 259; <u>Heggenmiller</u>, 128 F. App'x at 247; <u>Keyes</u> v. <u>Chamberlin</u>, 2011 WL 113445, at *5 (W.D. Pa. Jan. 13, 2011); <u>Brown</u> v. <u>Easton</u>, 2001 WL 722144, at *5 (E.D. Pa. June 25, 2001); <u>Poole</u> v. <u>City of Shreveport</u>, 2020 WL 11025910, at *9 (W.D. La. Dec. 30, 2020), <u>aff'd</u>, 13 F.4th 420 (5th Cir. 2021); <u>Jackson</u> v. <u>Vill. of Just.</u>, 2020 WL 1530734, at *4 (N.D. Ill. Mar. 31, 2020); <u>cf.</u> <u>Jauquet</u> v. <u>Green Bay Area Cath. Educ., Inc.</u>, 996 F.3d 802, 808-09 (7th Cir. 2021).

\*    \*    \*

The Administrator's argument as to Officer Avila runs aground on <u>Vann</u>.

Over a 14-year career, Officer Avila, as noted, was the object of one sustained excessive-force complaint, for which he was punished. <u>See</u> Ex. V at 56.

Was the punishment a "meaningful" attempt "to forestall further incidents"?  <u>Vann</u>, 72 F.3d at 1049.

As noted, Officer Avila was punished for pushing someone to the ground after she scratched his eye.  And he was punished with a 90-day suspension, seemingly followed by around three and a half years of assignment to non-patrol duties.

The Administrator, who bears the burden, <u>see</u> <u>King</u> v. <u>County of Gloucester</u>, 302 F. App'x 92, 99 (3d Cir. 2008), does not try to show that this punishment was insufficiently "meaningful." <u>Vann</u>, 72 F.3d at 1049.

And winning on such an argument might well have been an uphill climb for the Administrator.  Courts have determined that lesser punishments are enough to show that a city was not indifferent to an officer's prior use of excessive force.  <u>See</u>, <u>e.g.</u>, <u>Poole</u>, 2020 WL 11025910, at *8 ("'3 day fine'" for unspecified incident and "'5 day fine'" for punching a suspect); <u>Fonseca</u> v. <u>Alterio</u>, 2006 WL 8446735, at *8 (D. Conn. Aug. 16, 2006) (three-month suspension for excessive force); <u>Brown</u>, 2001 WL 722144, at *4-5 (two-month suspension for battering girlfriend followed by five-week suspension for contacting her again).[19]

---

[19]  Two things.  <u>First</u>, the Administrator's brief alludes at one point to a more modest argument.  Namely, that the City's supervisory failure was not that Officer Avila was allowed to patrol, but that he was allowed to do so unsupervised and without a partner.  <u>See</u> Opp. to City at 14.  But this argument is not developed.  And the burden here is the Administrator's. <u>Second</u>, as indicated in the text, Officer Avila was the subject of 8 excessive force complaints, one of which was substantiated. In <u>Beck</u>, the Third Circuit seemed to reason from a flurry of unsubstantiated complaints against an officer --- suggesting that a large number of similar complaints in a "narrow" time frame may itself be telling.  <u>See</u> <u>Beck</u>, 89 F.3d at 973.  But as to that point, <u>Beck</u> was concerned with a period during which there was one complaint every 5 or 6 weeks.  <u>See</u> <u>id</u>. at 974. Here, the frequency of complaints is greatly different.  A complaint every 10 or so months, 8 over 14 years.  Moreover, <u>Beck</u> focused on a situation in which complaints were not being assessed in a fair or even-handed manner.  <u>See</u> <u>id</u>. at 974-75. <u>Beck</u> does not seem to hold that courts should reason from the bare number of unsubstantiated accusations made against an

### 5.    The Evidence as a Whole

To this point, the Court has explained why the Administrator's four arguments, taken individually, cannot form the basis for a potentially winning Section 1983 failure-to-supervise claim.

Step back now to see the evidence as a whole.  See Forrest, 930 F.3d at 107.

It is this:

The City received 27 excessive-force complaints in 2013 to 2018 and at least partly sustained a small number of them.  See Part II.A.1.  The City allowed two junior officers to patrol together, see Part II.A.2, and allowed a veteran officer with one sustained use-of-force complaint to go out on the beat, after he had been disciplined.  See Part II.A.4.  And it did not ensure that certain officers accurately filled out incident reports.  See Part II.A.3.

Viewed all together, this evidence falls short of what it takes to make out a municipal failure-to-supervise claim.

To see the point, compare the overall weight of the Administrator's evidence to what was on the table in Forrest, where a failure-to-supervise claim survived summary judgment.

In Forrest, the plaintiff sued the City of Camden after an officer admitted to having lied about the events leading up to a drug raid.  See 930 F.3d at 100.  The plaintiff argued that Camden failed to supervise its officers.  See id. at 107.

The court of appeals agreed that the plaintiff's evidence could have convinced a reasonable jury of that, and so it reversed the district court's grant of summary judgment.  See id. at 108-09.

What was the failure-to-supervise evidence?  The Third Circuit split it up into six parts.  See id. at 101.

First, New Jersey's attorney general had conducted five reviews into Camden's policing, each one warning that the city was inadequately handling police misconduct.  One report cautioned that a failure to clear a 350-complaint backlog could count as deliberate indifference.  See id. at 101-02.

---

officer in cases like this one --- where no evidence has been put forward of flaws in the complaints-investigation process.

Second, Camden did not clear the backlog. It investigated few complaints. See id. at 102.

Third, the investigations that did occur "were seriously deficient." Id. Investigators failed to interview witnesses and based conclusions "solely" on officers' reports. See id.

Fourth, senior police officials testified that the department struggled to track its officers' whereabouts, failed to carry out performance reviews (contrary to the attorney general's recommendation), and maintained a too-high sergeant-to-officer ratio. See id. at 102-03.

Fifth, evidence showed that supervisors "had no concern" for officers' misconduct. Id. at 103. One officer testified that his supervisor "'most likely'" knowingly accepted false reports. See id. at 103-04.

Sixth, officers engaged in egregious misconduct, such as planting drugs or misappropriating narcotics, openly and without consequence. See id. at 104.

In short, in Forrest the failure-to-supervise evidence was (a) strong and (b) systematic.

But not here.

*    *    *

The evidence in this case is weakened by serious gaps.

The Administrator has come forward with "mere statistics," Beck, 89 F.3d at 973, 975, as to City's sustained rate. But the numbers are not yeasted with qualitative evidence. See Part II.A.1.

The Administrator has not explained why allowing two junior officers to patrol together fell below appropriate standards. See Part II.A.2.

She has not tied incident-report deficiencies to the cause of the incident here. See Part II.A.3.

And the Administrator has not shown how the City's punishment of the veteran officer for a separate, earlier incident was not a "meaningful attempt," Vann, 72 F.3d at 1049, to ensure that the officer conducted himself appropriately. See Part II.A.4.

In short: the component parts of the Administrator's failure-to-supervise evidence are not especially strong.

*     *     *

And the only substantial across-the-board evidence in this case is of a low sustained rate. But "mere statistics" can only bear so much weight. See Beck, 89 F.3d at 973, 975.[20]

And aside from that, there is simply a little here and a little there. Nothing systematic. Three officers who did an assertedly subpar job with their paperwork after a single incident. See Opp. to City at 13. Two junior officers who were allowed to patrol together. See id. at 13-14. And an officer who had previously acted improperly --- but who was punished for doing so. See id. at 14; Part II.A.4.

*     *     *

Looking at all this as a whole, the Court concludes that no reasonable jury, see generally Mirena v. Exec. Jet Mgmt., Inc., 760 F. Supp. 3d 224, 231-32 (D.N.J. 2024), could find that the City can be liable here on a failure-to-supervise theory.

The undisputed evidence falls short of establishing that the City made the "functional equivalent of a decision . . . to violate the Constitution." Connick, 563 U.S. at 61-62 (cleaned up).

### B.    **Training**

Pivot away from failure to supervise, and move to the Administrator's second argument for why the City is liable here --- its asserted failure to offer adequate training. See Opp. to City at 4-15.

This, too, is an especially hard claim for a plaintiff to make out.

Per the Supreme Court, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61.

For the City to be liable for a training failure, the Administrator must point to "a failure to provide specific

---

[20] And on a closer look, accounting at least for the criminal referral, the sustained rate is likely not as low as it first seems. See Part II.A.1.

training that has a causal nexus with the[] [plaintiffs'] injuries."  Reitz, 125 F.3d at 145.[21]

The Administrator argues that the failure-to-train was this: the City did not adequately teach its officers a particular standard operating procedure for dealing with an emotionally disturbed person ("EDP"), as the Plaintiff seems to have been when the Defendants interacted with him.  See Opp. to City at 13.[22]

In support of this, the Administrator presses two narrower arguments.

Take them up now.

### 1.   The Junior Officers

First, the Administrator zeroes in on the two junior officers.[23]

Officer Wanamaker, the Administrator notes, was trained on the EDP standard operating procedure.  But that was at the police academy --- where the document he signed to certify that he had worked through the training was one of around 250 documents he had to sign.  See Opp. to City at 13 (referencing Wanamaker Dep. at 109).

For his part, Officer Lucero also was trained on the EDP standard operating procedure.  But his training was not live; it

---

[21]  For a failure-to-train claim, there must ordinarily be a pattern of similar constitutional violations by untrained employees that gives decisionmakers a sense that better training is needed.  See Thomas v. Cumberland County, 749 F.3d 217, 223 (3d Cir. 2014).  The City argues that there were no real-world events that give it that sort of heads-up here.  See City's Motion at 18.  But put that aside.  Because even assuming arguendo it was on notice, the Court determines that the City is entitled to prevail on other grounds, as set out below.

[22]  The Administrator assumes that training on this particular EDP standard operating procedure was necessary.  But she does not explain why.  This might well be a serious problem for the Administrator's argument.  But there is no need to take it up here.  As set out in this Part II.B, there are other difficulties with the Plaintiff's failure-to-train claim, and those alone make it non-viable.

[23]  That is: two of the three Defendants, Officers Lucero and Wanamaker.

was online.  <u>See</u> <u>id</u>. (referencing City's Mot. for Summ. J., Ex. I ("Lucero Dep.") (ECF 103-9) at 133–35).

The Administrator does not explain why Officer Wanamaker's police academy training does not measure up, or why Officer Lucero's online training should be discounted.  <u>See</u> Opp. to City. at 13.

Hypothesize, though, that the argument is that these trainings was not calculated to ensure focus.  There was training fatigue, say, at the police academy.  And online training, the argument might run, is distracted training.

But if those are the arguments, they are not self-evidently correct.

On the one hand:

Wall-to-wall learning at a full-time police academy may potentially mean that one lesson blurs into the other, such that each one is quickly forgotten.

On the other hand:

Training at a dedicated academy may be especially intense and purposive --- and therefore deeply absorbed.  And a cadet's mind might be sharply focused while at the academy, as he works under the inevitable pressure that comes with wanting to do well enough to pass and become a police officer.

Which of these is right?

Hard to say.  <u>Cf.</u> John J. Sloan III & Eugene A. Paoline III, <u>"They Need More Training!": A National Level Analysis of Police Academy Basic Training Priorities</u>, 24 Police Q. 486, 509-10 (2021) (discussing debates about the right length of police training).

But it is the Administrator who bears the burden, <u>see</u> <u>Bd. of Cnty. Comm'rs</u>, 520 U.S. at 404, and she offers no reason to choose one inference over the other.  This undermines any argument that Officer Wanamaker's police academy EDP training cannot be counted as EDP training.

Same point as to online training.

Online training may be less vivid and less effective.

But maybe, for some, the opposite is true.  Some people may be especially attentive when they are not in a live classroom, when they are learning in the quiet, in front of a computer.[24]

It is for the Administrator, see Bd. of Cnty. Comm'rs, 520 U.S. at 404, to explain why the first take is more persuasive than the second --- to the point that Officer Lucero's online EDP training should be treated as if it did not happen.

But the Administrator does not develop any argument along these lines.

*    *    *

And another problem.

The Supreme Court has said that it will not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training." City of Canton v. Harris, 489 U.S. 378, 391 (1989).  Otherwise, "almost any encounter resulting in injury" could give rise to municipal liability. See id.

This means that to prevail on a failure-to-train theory, a plaintiff must specifically focus "on [the] adequacy of the training program in relation to the tasks the particular officers must perform."  Id. at 390; see also Woloszyn v. County of Lawrence, 396 F.3d 314, 325 (3d Cir. 2005) (noting that "broad and general" allegations of training deficiencies are inadequate).

But here, as noted, the Administrator says nothing about what the precise shortcoming was in the training Officer Wanamaker and Officer Lucero received.

And therefore, the Administrator cannot (and does not) suggest any causal link between what was missing and any injuries to the Plaintiff.

That, too, undermines her claim --- because, "with respect to plaintiff's failure to train theory, the central inquiry . . . is whether the failure to provide proper training actually

---

[24]  See Jon Marcus, With Online Learning, 'Let's Take a Breath and See What Worked and Didn't Work,' N.Y. Times (Oct. 6, 2022) https://www.nytimes.com/2022/10/06/education/learning/online-learning-higher-education.html (describing the uncertain state of research into online learning) (last visited Sept. 9, 2025).

caused [the plaintiff's] injury." Simmons v. City of Philadelphia, 947 F.2d 1042, 1070 (3d Cir. 1991) (cleaned up).

As to the asserted gap between non-police-academy training (which was not given) and the police-academy training (which was) --- what did that gap cause?

And if there was indeed a shortfall between live EDP training and in-person EDP training --- what real-world effect did that missing increment of training have on how the Plaintiff was treated?

These questions about causation are ones the Administrator does not address.

But without doing so, her argument that there were holes in the training of Officer Wanamaker and Officer Lucero cannot go anywhere --- because there has been no effort to show how those holes may have been what caused the officers to interact with the Plaintiff as they did.  See id.[25]

---

[25]  Causation is relatively easier to establish when a municipality offers no training in a given area.  Then, it can be more straightforward to draw a through line from lack of training to injury.  This is because the marginal gain from going from no training to some training is unmissably large. But once some substantial training has been provided, the added gain from any supposedly missing training diminishes --- and working through the impact of the missing piece of training can turn on complex questions.  For example, did failure to train a trucker on how to drive a large rig contribute to an accident? Almost surely "yes" if the trucker had zero training.  But if she had a CDL plus 25 hours of supplemental training, and the argument is that she needed five more hours --- that is plainly a trickier causation problem.  Assuming that 30 overall hours was in fact the benchmark that needed hitting, what precisely was lost in missing out on the last five hours?  What was caused by the missing training increment?  And what if the last five hours were spent on a simulator?  Would that count?  These are potentially difficult questions, with analogues to questions that are lurking in this case --- but that the Administrator does not seek to work through.

## 2.    **The Veteran Officer**

The Administrator's next failure-to-train argument relates to Officer Avila.

He testified that he had never seen the City's standard operating procedure for interacting with EDPs.  See Opp. to City at 5 (referencing Avila Dep. at 146–47).

But Officer Avila also testified that he received twice-yearly training as to EDPs, though not on the standard operating procedure the Administrator focuses on.  See Avila Dep. at 155:6–8.

The Administrator (who has the burden, see Bd. of Cnty. Comm'rs, 520 U.S. at 404) does not try to show that this biannual EDP training was inadequate --- or how its inadequacy might have helped to cause any injuries to the Plaintiff.

What precisely was the delta between Officer Avila's training (as to EDPs) and the Plaintiff's proposed alternative training (the EDP standard operating procedure) --- and what difference might that have made?

The Administrator does not say.

That leaves behind little more than a "broad and general," Woloszyn, 396 F.3d at 325, argument that Officer Avila should have received "better or more training."  City of Canton, 489 U.S. at 391.

But that is not enough to establish either that his training was inadequate or that any inadequacy caused a real-world impact. See id.

*    *    *

There is another stumbling block, too.

Assume that Officer Avila's training was wholly inadequate --- that, against the evidence, he received no training about how to interact with an EDP.

Might that be enough to establish that the City is liable here on a failure-to-train theory?

The Supreme Court has answered: no.

"That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the

27

officer's shortcomings may have resulted from factors other than a faulty training program." City of Canton, 489 U.S. at 390-91.

Circuit courts around the Nation have routinely ruled accordingly --- even when it was the untrained officer himself who caused the plaintiff's injury. See Benavidez v. County of San Diego, 993 F.3d 1134, 1154 (9th Cir. 2021); Lapre v. City of Chicago, 911 F.3d 424, 437-38 (7th Cir. 2018); Murphy v. City of Tulsa, 950 F.3d 641, 651-52 (10th Cir. 2019); Alman v. Reed, 703 F.3d 887, 903 (6th Cir. 2013); Plamp v. Mitchell Sch. Dist. No. 17-2, 565 F.3d 450, 462 (8th Cir. 2009); Blankenhorn v. City of Orange, 485 F.3d 463, 484-85 (9th Cir. 2007); Roberts v. City of Shreveport, 397 F.3d 287, 293-94 (5th Cir. 2005); Anthony v. City of New York, 339 F.3d 129, 140 n.6 (2d Cir. 2003) (dicta); Alexander v. City & County of San Francisco, 29 F.3d 1355, 1367-68 (9th Cir. 1994); Lord v. Riley, 921 F.2d 272 (4th Cir. 1990) (unpublished table decision); Perez v. City of Sweetwater, 770 F. App'x 967, 976 (11th Cir. 2019); Carey v. Helton, 70 F. App'x 291, 294 (6th Cir. 2003).

In the Sixth Circuit, for example, a plaintiff sued a county alleging that it failed to train its officers on handling emotionally disturbed detainees. See Carey, 70 F. App'x at 292. One officer had no recollection of ever receiving such training, but the court of appeals held that one officer's testimony is "insufficient to defeat summary judgment." Id. at 294.

In the Ninth Circuit, a plaintiff put forth evidence that a certain untrained officer used excessive force against him. Blankenhorn, 485 F.3d at 484. But the court of appeals held that because the plaintiff "limited his proof to the City's failure to train only [one officer], he did not meet his burden to withstand Defendants' motion for summary judgment." Id. at 485.

And the Eleventh Circuit reached roughly the same conclusion. The plaintiff there was injured in a police car chase. See Perez, 770 F. App'x at 969. He sued the city, claiming it had failed to properly train an officer involved in the chase. See id. at 969, 975-76. The court of appeals turned aside the claim. It held that the failure to train a particular officer, without more, was not enough. See id. at 975-76.

Each of these cases reaches the same conclusion. And each follows from, and cites, the Supreme Court's holding in City of Canton.

What this means: even if (again: against the evidence) Office Availa received no training on interacting with EDPs, the City could still not be liable, just on that basis, on a Section 1983 failure-to-train theory.

### 3.    The Evidence as a Whole

As before, see Part II.A.5, step back to look at things as a whole.  See Forrest, 930 F.3d at 107.

The Administrator's failure-to-train evidence adds up to this: Officer Avila received twice-a-year EDP training, but no training on a specific EDP standard operating procedure, see Part III.B.2; and Officers Lucero and Wanamaker received the standard operating procedure EDP training, but could have received it in a different (and presumably better) format, see Part III.B.1.

This falls short.  No reasonable jury could find this adds up to a failure-to-train.

To see the point, compare this case to Thomas v. Cumberland County, 749 F.3d 217 (3d Cir. 2014), in which the court of appeals held that the plaitnff's evidence of a failure to train was enough to survive the defendant's motion for summary judgment.  Id. at 227.

In Thomas, an inmate sued the county after a prison attack.  See id. at 220-21.  He alleged a failure to train correctional officers.  See id. at 219.  And his evidence was that "officers had no de-escalation or intervention training as a part of their pre-service training."  Id. at 225 (emphasis added).

In contrast to Thomas, where the officers got no relevant training, all three officers here received some training.  And two of the three received training on the precise EDP standard operating procedure that the Administrator suggests is necessary.

Moreover, in Thomas, "corrections officers" did not receive the relevant training.  See id. at 225 (emphasis added).

Here, the asserted evidence of no training on the EDP standard operating procedure zeroes in on just one officer.  But the Supreme Court has held that one officer's failure to train cannot "fasten liability," City of Canton, 489 U.S. at 390-91, on a municipality.

### C.    **Conclusion**

For the reasons laid out above in Parts II.A and II.B, the City's summary judgment motion as to Count II, the Administrator's Section 1983 claim for municipal liability, must be granted.

Looked at as a whole, the failure-to-supervise evidence would be insufficient for a reasonable jury, and the failure-to-train evidence would be, too.

## III. **The Officers**

Turn now to the claims that run against the three Defendants.[26]

The Administrator presses a federal claim against each of them, citing the Fourth Amendment and 42 U.S.C. § 1983 (Count I). Plus she makes state claims, for excessive force (Count III), assault and battery (Count IV), wrongful death (Count VII), and survival damages (Count VIII).

Consider here the federal claim.   The state claims are the focus of the next part, Part IV.

### A.    **The Legal Standard**

Against the federal Section 1983 claim, the Defendants raise a qualified immunity defense.

Officers are entitled to qualified immunity unless they violate a clearly established right.  See City of Escondido v. Emmons, 586 U.S. 38, 42 (2019).  The right must be defined at a close-in level, a specificity requirement that is "particularly important in excessive force cases."  Id.

The burden to show that an officer violated a clearly established right is the plaintiff's to carry.  See Dongarra v. Smith, 27 F.4th 174, 178 (3d Cir. 2022).

And though "plaintiffs need not find a case directly on point, they must cite existing precedent that puts the question [of what is clearly established] beyond debate."  Id. at 178 (cleaned up); see generally Courney v. City of Englewood, 2025 WL 2170694, at *4 & n.15 (D.N.J. July 30, 2025) (holding that it is the plaintiff's obligation to come forward with cases that

---

[26]  Recall: "Defendants" refers, collectively, to Officers Avila, Lucero, and Wanamaker.

"clearly establish" the governing legal principle) (collecting cases).

### B. **The Administrator's Cases**

As just noted, it is for the Administrator to spotlight on-point precedent.  See Dongarra, 27 F.4th at 178.

She tries to do that here by pointing to three cases.  But none of these work.

*   *   *

The Administrator's first case: Rivas v. City of Passaic, 365 F.3d 181 (3d Cir. 2004).

There, officers responded to a man who was having a seizure. See Opp. to Office Wanamaker at 5 (citing id. at 199–200).  The officers pressed down on his back until he lost consciousness. See Rivas, 365 F.3d at 199.  The court held that "a reasonable jury could find that the continued use of force against [the man] was excessive."  Id. at 200.

But that case is not a close match for this one.

The most notable difference: evidence in Rivas suggested that the man "did not present a threat to anyone's safety."  Id.  His hands were cuffed behind his back and he was also bound by cloth restraints, all as he lay on the ground in an enclosed space. See id. at 187, 199–200.

That is not analogous to the undisputed evidence here, of the Plaintiff kicking, striking, and spitting on officers and EMTs as they tried to get him to a hospital.  See Def. Kyle Wanamaker's Statement of Undisputed Material Facts (ECF 101-1) ¶¶ 16-17; Pl.'s Resp. to Def. Wanamaker's Statement of Undisputed Material Facts (ECF 120) ¶¶ 16-17; City's Facts ¶ 76, 79-82; Resp. to City's Facts ¶ 76, 79-82.

*   *   *

Next, the Administrator cites Giles v. Kearney, 571 F.3d 318 (3d Cir. 2009), for the proposition that "'an officer may not kick or otherwise use gratuitous force against an inmate who ha[s] been subdued.'"  Resp. to Officer Wanamaker at 6 (quoting Giles, 571 F.3d at 326).

But here, the undisputed evidence is that the Plaintiff, far from being "subdued," was struggling with the officers.  And so Giles, like Rivas, is not on point.

\*    \*    \*

Finally, the Administrator points to Couden v. Duffy, 446 F.3d 483 (3d Cir. 2006).  See Resp. to Office Wanamaker at 5 (citing Couden, 446 F.3d at 497).

But Couden is also off the mark.

The evidence there showed that four plainclothes officers pointed guns at a boy's head, handcuffed him, and sprayed him with mace --- even though he was cooperative and unarmed.  See 446 F.3d at 489, 497.

The Administrator does not say how Couden bears on this case, and the cases do not seem to have much in common factually.

\*    \*    \*

Not having pointed to a case that shows the Defendants violated clearly established law, the Administrator has not carried her burden.  See Courney, 2025 WL 2170694, at \*4 n.15.[27]

\*    \*    \*

This said, the Court has itself looked for on-point cases.

The closest one it has found, Aldaba v. Pickens, 844 F.3d 870 (10th Cir. 2016), favors the Defendants.

---

[27] The Administrator also points to two unreported opinions by district courts.  See Opp. to Officer Avila at 5-6 (citing Marshall v. Keansburg Borough, 2013 WL 6095475 (D.N.J. Nov. 20, 2013); Hurt v. City of Atl. City, 2010 WL 703193 (D.N.J. Feb. 24, 2010)).  But it is not clear that a district court's opinion can clearly establish the law.  See Courney, 2025 WL 2170694, at \*3 n.14.  (And it may be that unpublished district court opinions bear less weight yet.  See White v. Lucero, 135 F.4th 1213, 1220 (10th Cir. 2025) (unpublished district court cases "provide little support for the notion that the law is clearly established"); cf. Pinho v. Gonzales, 432 F.3d 193, 214 (3d Cir. 2005).)  In any event, neither of the cited district court cases is telling here.  Each involved an arrestee who was handcuffed and subdued when allegedly assaulted by police.  See Marshall, 2013 WL 6095475, at \*7; Hurt, 2010 WL 703193, at \*8.  As noted, that is not this case.

In <u>Aldaba</u>, a man sought to leave a hospital against a doctor's
warning.  <u>See</u> <u>id</u>. at 875.  When officers tried to keep the man
from leaving, he became "very angry" and refused officers'
orders to get on his knees.  <u>See</u> <u>id</u>. at 875-76.  After repeated
disobedience, the officers tased him.  <u>See</u> <u>id</u>. at 876.

To determine whether the officers might have violated a clearly
established right for qualified immunity purposes, the Tenth
Circuit looked to the cited cases.  <u>See</u> <u>id</u>. at 877-80.  It found
that none of them "would advise 'every reasonable official' that
[t]asering [the man] to hasten life-saving care would amount to
excessive force under the Fourth Amendment."  <u>Id</u>. at 879.
Qualified immunity was granted.  <u>See</u> <u>id</u>. at 880.

Here, as in <u>Aldaba</u>, police officers struggled with an impaired
man to ensure he would receive medical care.  And if anything,
this case is an easier one for applying qualified immunity.  In
<u>Aldaba</u>, the man who needed medical help did not physically
strike officers or medical professionals.  Here, he did.

                    *    *    *

The Defendants are entitled to qualified immunity as to the
federal claim (Count I) against them.

The Administrator has not carried her burden of coming forward
with "clearly established" law.  And the Tenth Circuit's <u>Aldaba</u>
decision provides an affirmative reason to think the Defendants
get qualified immunity here.[28]

---

[28]  An important qualifier.  The Administrator's legal brief
asserts that the Defendants "suffocat[ed]" or "choked" the
Plaintiff in the ambulance.  Opp. to Officer Lucero at 6, 9-11;
Opp. to Officer Wanamaker at 5-6; Opp. to Officer Avila at 5-6.
If there was evidence here that, say, the Defendants
intentionally worked to choke the Plaintiff --- the qualified
immunity analysis would run along a different track.  But what
counts on summary judgment is evidence, not argument.  <u>See</u>
<u>Bennett</u> v. <u>Spear</u>, 520 U.S. 154, 168 (1997) ("a plaintiff must
'set forth' by affidavit or other evidence 'specific facts' to
survive a motion for summary judgment"); <u>Lujan</u> v. <u>Defs. of
Wildlife</u>, 504 U.S. 555, 561 (1992) (on summary judgment "the
plaintiff . . . must 'set forth' by affidavit or other evidence
'specific facts'); <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 324
(1986) (summary judgment "requires the nonmoving party to go
beyond the pleadings and by her own affidavits, or by the
'depositions, answers to interrogatories, and admissions on

## IV.  **State Claims**

In addition to the above, the Defendants also move for summary judgment on the claims against them under New Jersey law --- for wrongful death (Count VII), survival damages, (Count VIII), excessive force (Count III), and assault and battery (Count IV). See Part I.B.

And the City takes the same tack.

It moves for summary judgment on the various state claims against it. See City's Br. at 21-25.  These are for wrongful death (Count VII), survival damages (Count VIII), and negligent retention and supervision (Count V).  See Part I.B.

*    *    *

_____

file,' designate 'specific facts showing that there is a genuine issue for trial.'"); Dawson v. Wash. Gas Light Co., 2021 WL 2935326, at *6 (4th Cir. July 13, 2021) ("[A]t the summary judgment stage, we are concerned with evidence rather than arguments.").  The Administrator's legal brief alludes to choking and suffocation, but it does so without citing evidence. And while the Rule 56.1 filings refer to an autopsy that found indications of "compressive choking," the materials put before the Court do not (a) define that presumably medical term; (b) describe the range of things that might later cause indications of "compressive choking;" or (c) explain what the autopsy finding might imply about what the Defendants or others may have done.  See Pl.'s Suppl. Statement of Undisputed Facts (ECF 104-1) ¶ 83.  It is for the Administrator to point to evidence, see Bennett, 520 U.S. at 168, and then to explain its arguable implications.  She has not done so, and the Court cannot leap from an unexplained medical term in an autopsy report to a sense of what happened here.  It is at least possible that there is record evidence on all of this that was erroneously not brought to the Court's attention --- and if so, there may be an argument that that evidence, and argument based on it, should now be considered by the Court.  In light of all this, the Court will stay its decision of today until September 26 at noon.  Should the Administrator wish to make new arguments or to put forward new evidence, it must file a motion by September 25 at noon seeking permission to do so.  The United States Magistrate Judge would be the one to take up any such motion.  And while the Magistrate Judge does so, today's decision would remain stayed.

While the Court had original jurisdiction over the federal claim, see Complaint ¶ 1, it has only pendent jurisdiction over the state claims.  See id. ¶ 2.

And where, as here, see Part II and Part III, "the claim[s] over which the district court has original jurisdiction [are] dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (cleaned up).

No party has argued that any such "considerations" apply here.

*     *     *

And moreover: the nature of the Administrator's state claims cuts in favor of dismissal.

For example, one of the Defendants argues that he is immune from liability under New Jersey's Good Samaritan Act.  See Officer Wanamaker's Rep. Br. (ECF 108) at 3 (citing N.J.S.A. § 2A:62A-1.1).  How, if at all, should that background immunity be layered onto already-existing state-law immunities that police officers enjoy as a matter of New Jersey law?

These sorts of questions of New Jersey law are far afield from anything that has been considered here.

Or another example.

One of the Administrator's state-law claims against the City concerns negligent supervision.  See Complaint ¶¶ 68-74.

But that claim implicates the possibility that New Jersey law might be taken to require more supervision than is required to defend, as the City has here, against a federal failure-to-supervise claim.  And whether New Jersey law requires clearing a higher workplace-supervision bar may turn on complex policy questions --- as to how the state's local police forces should be staffed and managed.

Policy-laden state law questions should be taken up by state courts, not this one.  See Carrillo v. Owen, 2019 WL 4200438, at *4 (D.N.J. Sept. 5, 2019) (declining to exercise pendent jurisdiction over remaining state assault and battery claims against officers); see also Rxeed LLC v. Caremark LLC, 771 F. Supp. 3d 495, 501-02 (D.N.J. 2025); Pinkston v. City of Jersey City, 699 F. Supp. 3d 298, 305 (D.N.J. 2023). Walsifer v. Borough of Belmar, 2006 WL 2990364, at *16 (D.N.J. Oct. 18, 2006), aff'd, 262 F. App'x 421 (3d Cir. 2008) ("Because important considerations of municipal governance and law are

involved, it is particularly appropriate that this aspect of the case be decided by state courts.").

*    *    *

The Court declines to exercise jurisdiction over the state law claims here.

## V.    Conclusion

As to the federal claims, the City's motion for summary judgment is granted and so is the Defendants'.

The Court will not retain jurisdiction over the state law claims.

The Court stays today's Order, as set out in footnote 28, until September 26 at noon.

IT IS on this 10th day of September, 2025, so **ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.